**FILED**

JUL 18 2016

CLERK

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA, <u>EX REL</u>
DR. JOHN A. MILLIN,

               Plaintiff/Relator,

v.

LARRY F. KRAUSE, an individual, and
KRAUSE-ALLBEE TRUCKING, INC., a
South Dakota corporation

               Defendants.

Case No. C) V 16-4103

**FILED *IN CAMERA* AND**
**UNDER SEAL**
**FALSE CLAMS ACT**
**COMPLAINT**

**DEMAND FOR TRIAL BY JURY**

## I.    JURISDICTION AND VENUE

1.    On behalf of the United States, Plaintiff/Relator, Dr. John A. Millin ("Relator"), brings this Complaint under Title 31 U.S.C. § 3729 *et seq*., as amended, commonly known as the False Claims Act ("False Claims Act") to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.    The Court has jurisdiction over Relator's state law claims pursuant to 28 U.S.C. § 1367 as the state law claims are so related to Relator's claims giving the Court original jurisdiction in this case that the state law claims form part of the same case or controversy.

3.    Venue for Relator's False Claims Act claims is appropriate in this Court pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact business in the District of South Dakota.

4.     Venue for Relator's state law claims is appropriate in this Court pursuant to 28

U.S.C. § 1391(b) because Defendants are located here, Relator's claims arose in substantial part

in this District, and because this Court has personal jurisdiction over Defendants in this District.

## II.     SUMMARY OF ACTION

5.     Defendants maintain large farming operations in South Dakota and Minnesota,

including but not limited to current or past farming operations in Brown County, Campbell County,

and McPherson County, South Dakota, and Beltrami County, Minnesota.  From at least 2002 and

continuing, and upon information and belief until the present time, Defendants have made or

caused to be made false claims for payment to the United States Department of Agriculture, Farm

Services Agency ("FSA") in connection with farm subsidy payments, farm disaster payments,

and/or loans for farmers (collectively, "farm subsidies") in violation of applicable federal and state

law, regulations, and rules.  The claims were false because Defendant Larry F. Krause ("Krause")

misrepresented the ownership of Defendant Krause-Allbee Trucking, Inc. ("Krause-Allbee

Trucking"), and potentially other entities through which he farmed, in order to obtain payments to

which he would otherwise not be entitled.  Specifically, Krause misrepresented that Relator and

Relator's former wife, Lori Ann Millin ("Lori Millin" or "Ms. Millin"), were owners of Krause-

Allbee Trucking, when, in fact, Relator did not have such ownership interest in Krause-Allbee

Trucking, and Ms. Millin, did not have such ownership percentage in Krause-Allbee Trucking as

was represented by Defendants to the FSA.  Krause caused and causes Krause-Allbee Trucking to

authorize him to conduct all business on behalf of Krause-Allbee Trucking with the FSA by filing

Corporate Authorization Resolutions allowing Krause to file documents for Krause-Allbee

Trucking with the FSA; such Corporate Authorization Resolutions assisted and assists Defendants

in committing their fraud against the United States.  Because Relator and Ms. Millin were never

actively engaged in farming with Defendants, they were not eligible for payments under any farm subsidy program.  These false claims allowed Defendants to circumvent the payment limitations for farm subsidies and receive substantially more in farm subsidy payments than the law allowed them to receive.

### III.    OVERVIEW OF STATUTORY FRAMEWORK

6.    As an overview to the detailed statutory framework provided in Section VI infra, this section provides a brief overview of the FSA and farm subsidies.

7.    The FSA provides farm subsidies to persons actively engaged in farming through various programs.  Depending on the farm bill applicable at the time, a person engaged in farming may be eligible to receive marketing loans, direct payments, counter-cyclical payments, payments under revenue assurance programs, and/or disaster assistance.  Direct payments are paid at a set rate every year to eligible farmers, regardless of conditions or crop yield.  Counter-cyclical payments are paid to eligible farmers when the market prices for crops fall below certain thresholds.  Revenue assurance programs ensure overall profitability for a given crop by paying eligible farmers if they do not receive sufficient revenue from their crops in the market.  Marketing loans offer eligible farmers favorable terms.  Disaster payments allow eligible famers to recoup losses due to natural phenomena.  Finally, the government may subsidize crop insurance to protect farmers.

8.    The applicable farm bills for this case are the 2002 Farm Bill, the 2008 Farm Bill, and the 2014 Farm Bill. In order to obtain any farm subsidy payment under the 2002 Farm Bill, the 2008 Farm Bill, or the 2014 Farm Bill, a farmer must first file a Farm Operating Plan with the FSA in each county where the farmer anticipates that he will request any type of farm subsidy. The actual form used for the Farm Operating Plan varies on whether the farm is owned

individually, as a joint venture or general partnership, or by an estate or trust. *See, e.g.*, Forms CCC-502A, CCC-502B, CCC-502C, and CCC-502D. All forms, however, ask for information about the ownership of the farming operation. Once the Farm Operating Plan is filed, then the farmer can apply for farm subsidy payments.

9.      The 2008 Farm Bill and the 2014 Farm Bill also require records to be kept showing that all claimed officers and directors in a corporation were actively engaged in farming.

## IV.    PARTIES

10.     Defendant Krause-Allbee Trucking is a South Dakota corporation with a principal place of business at 37585 149th Street, Mansfield, SD 57640-5003. Upon information and belief, Krause-Albee Trucking has farming operations in Brown County, SD, and has, or at times had, farming operations in Campbell County, SD, and McPherson County, SD.

11.     Defendant Krause is a South Dakota resident who is married to Letitia Krause ("Ms. Krause" or "Letitia Krause"). This is the second marriage for Krause. Krause farms, as an individual, in Brown County, SD and has, or at times had, farmed, as an individual, in Campbell County, SD, McPherson County, SD, and Beltrami County, MN.

12.     Relator is a Kentucky resident and Kentucky-licensed ophthalmologist. He is not and never has been actively engaged in the farm management of, nor has he farmed, any land in South Dakota or in any other state as such terms are defined by the FSA. At one time, Relator owned farming land in South Dakota with Ms. Millin, but Relator and Ms. Millin would not have qualified for any farm subsidy payment because they were not actively engaged in farming. At one time, a representative from the Internal Revenue Service apparently determined that Relator and Ms. Millin were not eligible to deduct interest paid on the loan for the South Dakota farmland

because the couple was not actually farming the land.  Ms. Millin received the South Dakota farmland in the divorce decree.

## V.     THE FALSE CLAIMS

**Relationship of the Parties and Entities**

13.     In 1996, Relator married Ms. Millin, the daughter of Krause and Krause's first wife.

14.     Throughout their married life, neither Relator nor his wife were actively engaged in the management of any farming operations in South Dakota, Minnesota, or elsewhere as the term "actively engaged in the management of any farming operations" is defined by the FSA. Instead, Relator worked as an ophthalmologist.  Ms. Millin worked in various positions throughout the marriage.

15.     In 2014, Ms. Millin filed for divorce in Wyoming.

16.     At certain times, in addition to Krause's own individual farming operations, Krause has held interests in various corporate entities, which have also been involved in farming, including but not limited to the following:

A.     Krause-Allbee Trucking is a South Dakota corporation.  Upon information and belief, Krause-Albee Trucking was formed in April of 1989 under the laws of the State of South Dakota and is currently an active corporation.  According to Krause-Albee Trucking's 2015 Annual Farm Report, submitted to the South Dakota Secretary of State, Krause is currently the registered agent for Krause-Albee Trucking.

B.     Krause-Allbee Farming, Inc. is a South Dakota corporation ("Krause-Allbee Farming").  Upon information and belief, Krause-Allbee Farming was formed in March of 1990 under the laws of the state of South Dakota and is currently in good standing.  According to Krause-Allbee Farming's 2016 Annual Farm Report, submitted to the South Dakota Secretary of

State, Krause is the President and registered agent of Krause-Albee Farming.  Upon further information and belief, Krause and/or his wife are the actual owners and officers of Krause-Allbee Farming, regardless of the existence of any documents or filings that may state differently.

        C.    L&L General Partnership is a South Dakota partnership ("L&L Partnership").  Upon information and belief, L&L Partnership is a general partnership between Krause and Letitia Krause.  L&L Partnership has existed since at least 2009 but, upon information and belief, may have been existence before 2009.  Upon information and belief, L&L Partnership is engaged in farming operations in South Dakota.

        D.    K & L Land & Cattle, LLC is a South Dakota limited liability company also authorized to do business in Minnesota ("K&L LLC").  Upon information and belief, K&L LLC was formed in February of 2015 as a South Dakota LLC and then registered in Minnesota as a foreign LLC.  Krause is the registered agent of K&L in South Dakota, and Kimberly Fraser, Krause's step-daughter, is the registered agent of K&L in Minnesota and Krause is the manager.

        E.    McPherson County Farm, LLC is a South Dakota limited liability company ("McPherson LLC").  Upon information and belief, McPherson LLC was formed in May of 2001, and dissolved in April of 2009.  Krause was a member of McPherson LLC.  McPherson LLC was involved in farming operations in South Dakota, including but not limited to such operations in McPherson County, South Dakota.

**2002 Krause-Allbee Trucking's False Filings to the FSA**

        17.    At some point during their marriage, and perhaps as early as 2002, Krause informed Relator and Ms. Millin that they owned and/or would own the stock of Krause-Allbee Trucking.

18.     Krause prepared and signed documents that were filed with the FSA or United States Department of Agriculture (Commodity Credit Corporation) in 2002 indicating that Relator and Ms. Millin owned Krause-Allbee Trucking stock.

19.     The 2002 Farm Operating Plan, which Krause signed on behalf of Krause-Allbee Trucking, indicated that Ms. Millin owned 43% of Krause-Allbee Trucking's stock, Relator owned 24% of Krause-Allbee Trucking's stock, and Joan Allbee (Krause's sister) owned 33% of Krause-Allbee Trucking's stock.

20.     Krause signed other documents on behalf of Krause-Allbee Trucking, and upon information and belief, delivered said documents in 2002 to the FSA's office located in Aberdeen, South Dakota.  For example, Krause, by and behalf of Realtor, signed a 2002 Designation of "Permitted Entities," which stated that Relator designated Krause-Allbee Trucking to be the "permitted entity" to receive any FSA payments to which he was entitled.  Relator never made such designation.  Krause also signed a 2002 Member's Information Form on behalf of Krause-Allbee Trucking, which stated that Relator owned a 24% share and Ms. Millin a 43% share in Krause-Allbee Trucking.

21.     Thereafter, the FSA sent a letter on or about April 30, 2002, to Krause-Allbee Trucking wherein it determined, among other things, that:

The Corporation is properly chartered.

The stockholders and their share of the outstanding stock is:

| Member Name | % of Stock |
|---|---|
| Lori Millin | 43 |
| John Millin | 24 |
| Joan Allbee | 33 |

The Corporation is "actively engaged in farming."

The Corporation is considered a "person" for payment limitation purposes combined with John Millin and Lori Millin.

The stockholder has designated the Corporation as a permitted entity; therefore, 100 percent of any payment earned, within the applicable payment limitation, will be paid.

This determination will remain in effect for the current and subsequent years and you will not be required to file a farm operating plan unless a change occurs that would affect the determination or you request benefits under an annual program.

22.     The filings with the FSA stating the ownership  of Krause-Allbee Trucking described above were false.

## 2004 Krause-Allbee Trucking's False Filings to the FSA

23.     Upon information and belief, Krause-Allbee Trucking's filings to the FSA in 2003, including a Farm Operating Plan, were the same as those in 2002. Those filings were false because they listed Relator and Ms. Millin as owners of Krause-Allbee Trucking.

24.     Krause-Allbee Trucking's annual report for 2004 filed with the South Dakota Secretary of State indicates that 1) Krause is "Acting Manager & President;" 2) the Directors are Relator, Ms. Millin, and Ms. Krause; and 3) the form was signed by Krause as President.

25.     The Annual Farm Report filed with the South Dakota Secretary of State on or about March 19, 2004, and signed by Krause as President indicates that there were 100,000 shares in Krause-Allbee Trucking owned by the following:

| Name | Number of Shares |
| --- | --- |
| Lori Ann Millin | 43,000 |
| John A. Millin | 24,000 |
| Letitia M. Krause | 33,000 |

26.     Documents were filed by Krause-Allbee Trucking in 2004 with the FSA, including a Farm Operating Plan, and signed by Krause as "Manager," identifying the stockholders as:

| Member Name | % of Stock |
| --- | --- |
| Lori Millin | 43% |
| John Millin | 24% |
| Letitia Krause | 33% |

27.     Further, upon information and belief, a Corporate Authorization Resolution was also filed with the FSA by the Krause-Allbee Trucking in 2004 that includes the following statement: "Resolution was made on January 19, 2004 that **Krause as Manager has full right to make decisions regarding the FSA and sign all necessary papers for Krause-Allbee Trucking, Inc.**" (emphasis added).

28.     The filings with the FSA and South Dakota Secretary of State stating the ownership of Krause-Allbee Trucking described above were false.

**2006 Krause-Albee Trucking's False Filings to the FSA**

29.     Upon information and belief, Krause-Allbee Trucking's filings to the FSA in 2005, including a Farm Operating Plan, were the same as those in 2004.  Those filings were false because they listed Relator and Ms. Millin as owners of Krause-Allbee Trucking.

30.     Documents filed in 2006 with the FSA by Krause-Allbee Trucking, and signed by Krause as "Manager," including a Farm Operating Plan, identified the stockholders as:

| Member Name | % of Stock |
|---|---|
| Lori Millin | 43% |
| John Millin | 32% |
| Brian Ellison | 25% |

31.     Krause also signed a Designation of Permitted Entities form on behalf of Relator in 2006 stating that Krause-Allbee Trucking is a permitted entity through which Relator agreed to receive any FSA payments.  Relator never made such designation.

32.     Krause also signed a Member's Information form on behalf of Relator in 2006 stating that Relator had a 32% share and Ms. Millin a 43% share in Krause-Allbee Trucking stock.

33.     On or about March 23, 2006, the FSA sent Krause-Allbee Trucking a letter that included the following statement:  "Based on the information submitted, the Committee understands that Krause Allbee Trucking Inc. is a properly charted [sic] corporation having 3

9

stockholders, Lori Millin – 43%, John Millin – 32% and Brian Ellison-25%." Said March 23, 2006, letter also included the following statements:

> The corporation is "actively engaged in farming."

> The corporation is a "person" for payment limitation, combined with Lori & John Millin, husband & wife owning 75% of the corporation.

> The stockholders have designated the corporation as a permitted entity; therefore, 100 percent of any payment earned, within the applicable payment limitation, will be paid.

> These determinations will remain in effect for the current and subsequent years and you will not be required to file a farm operating plan unless a change occurs that would affect the determination or you request benefits under an annual program.

34.     Krause-Allbee Trucking's annual report for the year 2006 filed with the South Dakota Secretary of State indicates that 1) Krause is "Acting Manager;" 2) the Directors were Relator, Ms. Millin, and Brian Ellison; and 3) the form was signed by Krause as Acting Manager.

35.     The Annual Farm Report filed with the South Dakota Secretary of State on or about March 9, 2006, and signed by Krause as Acting Manager indicates that there are 100,000 shares in Krause-Allbee Trucking that are owned by the following:

| Name | Number of Shares | Degree of Kindred |
|------|------------------|-------------------|
| Lori Ann Millin | 43,000 | Wife |
| John A. Millin | 32,000 | Husband |
| Brian Ellison | 25,000 | Brother |

36.     The filings with the FSA and South Dakota Secretary of State stating the ownership of Krause-Allbee Trucking described above were false.

**2007-2009 Krause-Allbee Trucking False Filings to the FSA**

37.     Upon information and belief, documents filed in 2007, 2008, and/or 2009 with the FSA by Krause-Allbee Trucking, including Farm Operating Plans, show a similar ownership

10

structure to that as stated in 2006. Those filings were false because they listed Relator and Ms. Millin as owners of Krause-Allbee Trucking.

38.     Upon information and belief, documents were filed in 2007, 2008, and/or 2009 with the FSA by Krause-Allbee Trucking, and signed by Krause as "Manager," including Farm Operating Plans, identifying the stockholders as Ms. Millin 50% and Relator 50% and included minutes of the corporate meeting dated January 14, 2009, indicating that Relator and Ms. Millin were the only stockholders of Krause-Allbee Trucking.

39.     Further, the documents filed in 2009, including the Farm Operating Plan, with the FSA indicate that Relator and Ms. Millin were guarantors of a financial institution loan to Krause-Allbee Trucking with the "First State Bank of Warner, Warner, SD." Krause and First State Bank of Warner have since represented to counsel for Relator that neither Relator nor Ms. Millin had guaranteed any loan for Krause-Allbee Trucking.

40.     Krause-Allbee Trucking's annual report for the year 2009 filed with the South Dakota Secretary of State indicates that 1) Ms. Millin is President and a Director; 2) Relator is Vice President and Director; and 3) Krause is the Registered Agent.

41.     The Annual Farm Report filed with the South Dakota Secretary of State on or about August 27, 2009, indicates that there are 100,000 shares in Krause-Allbee Trucking that are owned by the following:

| Name | Number of Shares |
|------|------------------|
| Lori Ann Millin | 50,000 |
| John A. Millin | 50,000 |

42.     On or about August 28, 2009, the FSA sent Krause-Allbee Trucking a letter that included the following statement: "The Committee understands that Krause Allbee Trucking Inc. is a properly chartered corporation having two stockholders. Partnership interests are as follows:

Lori Millin 50%, John Millin 50%."  Said August 28, 2006 letter also included the following

statements:

> Based on the information submitted, the Committee determined the following:
>
> You are "actively engaged in farming" and eligible for payments and benefits that may be requested under programs subject to the payment eligibility and payment limitation provisions.
>
> Adjusted Gross Income provisions have been met based on your certification.
>
> You are restricted to one limitation for payment limitation purposes and payments will also be attributed to the stockholders in accordance with the ownership share represented.

43.     The 2007-2009 filings with the FSA and South Dakota Secretary of State stating

the ownership of Krause-Allbee Trucking described above were false.

**2010-2015 Krause-Albee Trucking's False Filings to the FSA**

44.     Upon information and belief, Krause filed documents, including but not limited to

Farm Operating Plans, in 2010 and 2011 on behalf of Krause-Allbee Trucking indicating that there

were no ownership changes for 2010 and 2011, meaning that Defendants represented to the FSA

that Relator and Ms. Millin each owned 50% of Krause-Allbee Trucking. Defendants further

represented on the Farm Operating Plans that Relator and Ms. Millin were guarantors of the loan

at First State Bank in Warner, even though Krause and the First State Bank in Warner have since

represented that neither Relator nor Ms. Millin ever guaranteed any such loan.  All such Farm

Operating Plans and other documents stating the above ownership were false.

45.     Upon information and belief, Krause filed documents, including but not limited to

Farm Operating Plans, in 2012 on behalf of Krause-Allbee Trucking identifying the corporation's

stock holders as Ms. Millin 50% and Relator 50%.  All such Farm Operating Plans and other

documents stating the above ownership were false.

12

46.     Krause signed a Farm Operating Plan in 2013 on behalf of Krause-Allbee Trucking identifying the corporation's stock holders as Ms. Millin 50% and Relator 50%. Defendants further represented on the 2013 Farm Operating Plan that Relator and Ms. Millin were guarantors of the loan at First State Bank in Warner, even though Krause and the First State Bank in Warner have since represented that neither Relator nor Ms. Millin ever guaranteed any such loan.

47.     Upon information and belief, Krause filed documents, including but not limited to Farm Operating Plans, in 2014 and 2015 on behalf of Krause-Allbee Trucking identifying the corporation's stock holders as Ms. Millin 50% and Relator 50%. All such Farm Operating Plans and other documents stating the above ownership were false.

48.     The false claims and documents submitted by or on behalf of Krause in order to obtain FSA payments, including the Farm Operating Plans and other documents, were material to the false claims alleged herein. The Farm Operating Plans had a natural tendency to influence, or be capable of influencing, the payment or receipt of money because the Farm Operating Plans and other documents were material to the FSA's decision-making process for determining the amount of farm subsidies to which Defendants were entitled.

49.     Further, the false claims and documents were material to the FSA's determination on whether Krause, in his individual capacity, was entitled to farm subsidies and whether Krause-Allbee Trucking was entitled to farm subsidies.  Relator believes that Krause, individually and/or in combination with his wife, exceeded the income eligibility limits to receive farm subsidies (which are stated in Section VI infra). For example, Krause and/or his family members told Relator that Krause farmed about 10,000 acres in South Dakota; was involved with cattle operations; and he spent more than $2 million on seed in one year. Based on these statements, and after observing Krause for years, Relator believes that Krause may have been ineligible to receive farm subsidies

in the amount he received due to the income eligibility limits.  Thus, upon information and belief, Krause used Krause-Allbee Trucking to receive farm subsidy payments to which he was not entitled due to income eligibility limits.  Additionally or alternatively, the false claims and documents were material to the FSA's determination on whether Krause was entitled to the farm subsidy payments he received individually or through other entities, such as Krause-Allbee Farming.  The farm bills impose limits on the total amount of farm subsidies an individual can receive through either an individual's own farming operations or a company's farm operations in which the individual owns an interest.  Upon information and belief, Defendants made false claims and submitted false documents to the FSA showing that Krause did not hold an interest in Krause-Allbee Trucking to maximize the farm subsidy payments that Krause received.  If Krause did own shares in Krause-Allbee Trucking (and truthfully reported such ownership to the FSA), then Krause's farm subsidy payments would have been capped according to the eligibility limits under the applicable farm bill.  By listing Relator and Ms. Millin as owners of Krause-Allbee Trucking, Defendants were able to receive farm subsidy payments to which they would not have been entitled if Krause and his wife were listed as the owners of Krause-Allbee Trucking.

50.     On information and belief, the stock ownership records regarding Krause-Allbee Trucking are confusing and convoluted.  On July 15, 2015, the attorney for Krause (or Defendants) stated the following to Relator's counsel regarding the stock ownership records of Krause-Allbee Trucking:

> Pages 29 and 30 of the corporate records show the stock ownership transfers from 1990 to date.  Over the years, Larry and Letitia have acquired all the shares, except for Lori's shares.  At the current time, Lori Krause Millin owns 9,000 of the outstanding shares.  However, the 91,000 shares Larry and Letitia acquired have been transferred back to the corporation with the obligation that:
>
> *"At any time Krause-Allbee Trucking, Inc. finds a buyer for the shares, the company must be appraised to determine value of stock.  When the stock is sold,*

*the proceeds go to [Larry Krause or Letitia Krause].  Share can only be sold to next of kin."*

It appears that Krause and/or Letitia Krause have attempted to conceal their ownership of stock and have otherwise failed to properly represent to FSA the ownership of stock in Krause-Allbee Trucking.

51.     Approximately two weeks after Krause's counsel received a letter from Relator's counsel inquiring into Relator's ownership of Krause-Allbee Trucking, Krause filed paperwork with the South Dakota Secretary of State listing Relator's then-minor sons as members of Krause-Allbee Trucking's board of directors.  To Relator's knowledge, neither of his sons are actively engaged in farming or know anything about farming.

**Other Potentially False Filings**

52.     Relator offers the following information, to the extent that such information is helpful, to show a pattern and practice by Krause of operating multiple entities, potentially with false information regarding ownership:

A.     As stated above, Relator believes that Krause and Letitia Krause are the actual owners and operators of Krause-Allbee Farming.  To the extent that Krause or Krause-Allbee Farming made any indication to the contrary in any documents filed with the FSA or the United States Department of Agriculture, such documents and claims would be false.

B.     As stated above, Relator believes that L&L Partnership is a general partnership between Krause and Letitia Krause.  To the extent that Krause or L&L Partnership made any indication to the contrary in any documents filed with the FSA or the United States Department of Agriculture, such documents and claims would be false.

C.     Upon information and belief, Defendants did not maintain the proper (and accurate) records as required by the 2008 Farm Bill and the 2014 Farm Bill, including documents

relating to corporate owners' involvement and management of the corporation, specifically whether a corporate owner was actively engaged in farming or the management of a farming operation.

        D.      Defendants may have filed other false documents with the FSA for Krause-Allbee Trucking, including but not limited to Member's Information forms, and Designation of Permitted Entities forms, similar to the false forms that Defendants submitted in 2002 and 2006.

        E.      Krause filed a 2004 Continuation Sheet for Leased or Owned Land with the FSA in which he stated that he farmed with McPherson County Farms and Krause-Allbee Farms. Krause did not list Krause-Allbee Trucking as an entity through which he farmed. Upon information and belief, this information is false as Krause farmed through Krause-Allbee Trucking. Any other Continuation Sheet for Leased or Owned Land filed by either Defendant with the FSA which made similar representations would also be false.

**2008 FSA Payments**

53.     Upon information and belief, in 2008, Krause, through his ownership in the various entities, received a total of $307,924 in payments from the FSA.

**2009 FSA Payments**

54.     Upon information and belief, in 2009, Krause, through his ownership in the following entities, received a total of $62,506 in the following payments from the FSA:

| PROGRAM | Krause-Allbee Farming | Krause-Allbee Trucking | L&L Partnership | Krause |
|---|---|---|---|---|
| Direct Payments | | | $22,364 | |
| ACRE | $30,766 | $6,844 | $2,532 | |
| Total Payments Attributed to Krause | $30,766 | $6,844 | $24,896 | |

Total Direct / ACRE Payments: $62,506

16

**2010 FSA Payments**

55.     Upon information and belief, in 2010, Krause, through his ownership in the

following entities, received a total of $347,134 in the following payments from the FSA:

| PROGRAM | Krause-Allbee Farming | Krause-Allbee Trucking | L&L Partnership | Krause |
|---|---|---|---|---|
| Direct Payments | | | $23,378 | |
| ACRE | $30,766 | $6,844 | $2,532 | |
| SURE | $58,574 | $61,884 | | $66,237 |
| SURE 2010 Received Payments for the 2008 Crop Year | $41,426 | $12,996 | | $33,763 |
| 2009 Crop Disaster Program | | $8,734 | | |
| Total Payments Attributed to Krause | $130,766 | $90,458 | $25,910 | $100,000 |
| Total Direct/Acre Payments for All Entities/Person: $63,520 | | | | |
| Total SURE Payments for All Entities/Person: $283,614 | | | | |

**2011 FSA Payments**

56.     Upon information and belief, in 2011, Krause, through his ownership in the

following entities, received a total of $72,205 in the following payments from the FSA:

| PROGRAM | Krause-Allbee Farming | Krause-Allbee Trucking | L&L Partnership | Krause |
|---|---|---|---|---|
| Direct Payments | | | $30,938 | |
| ACRE | $28,980 | $6,844 | $2,532 | |
| SURE | | | | |
| 2009 Crop Disaster Program | | $2,911 | | |
| Total Payments Attributed to Krause | $28,980 | $9,755 | $33,470 | |
| Total Direct/Acre Payments for All Entities/Person:  $69,294 | | | | |
| Total SURE Payments for All Entities/Person: $2,911 | | | | |

**2012 FSA Payments**

57.     Upon information and belief, in 2012, Krause, through his ownership in the

following entities, received a total of $258,104 in the following payments from the FSA:

| PROGRAM | Krause-Allbee Farming | Krause-Allbee Trucking | L&L Partnership | Krause |
|---|---|---|---|---|
| Direct Payments | | | $28,742 | |
| ACRE | $590 | $140 | $2,580 | |
| SURE | $68,518 | $32,652 | $124,882 | |
| 2009 Crop Disaster Program | | | | |
| Total Payments Attributed to Krause | $69,108 | $32,792 | $156,204 | |

Total Direct/Acre Payments for All Entities/Person: $32,052
Total SURE Payments for All Entities/Person: $226,052

## 2013 FSA Payments

58.     Upon information and belief, in 2013, Krause, through his ownership in the following entities, received a total of $108,585 in the following payments from the FSA:

| PROGRAM | Krause-Allbee Farming | Krause-Allbee Trucking | L&L Partnership | Krause | K&L LLC[1] |
|---|---|---|---|---|---|
| Direct Payments | | | $26,277 | | |
| ACRE | $56,006 | $10,038 | $2,359 | | $7,627 |
| SURE | | | | | |
| 2009 Crop Disaster Program | | | | | |
| Conservation Reserve Program | | | | | |
| Total Payments Attributed to Krause (only one-half of K&L LLC included) | $98,493.50 | | | | |

Total Direct/Acre Payments for All Entities/Person: $98,493.50
Total SURE Payments for All Entities/Person: $0

## False Claims for Other Years

59.     Upon information and belief, Krause, Krause-Allbee Farming, Krause-Allbee Trucking, L&L Partnership, and K&L LLC continued to receive farm subsidy payments from the

---

[1] Upon information and belief, Krause is a one-half owner of K&L LLC.  As such, only one-half of payments to K&L LLC are attributed to Krause.

FSA for crop years 2014 and 2015 based on the false information presented to the FSA by Defendants in the Farm Operating Plans and other documentation.

**Representations in the Divorce Action**

60.     Ms. Millin filed an action for divorce against Relator in 2014.

61.     During the pendency of the divorce action between Relator and Ms. Millin, representations were made by Ms. Millin's attorney to Relator that neither Relator nor Ms. Millin had any ownership rights in Krause-Allbee Trucking, and that Krause-Allbee Trucking was owned by Krause.

62.     The representations by Ms. Millin's attorney were, upon information and belief, inconsistent with the documents filed with the FSA, as stated above.

63.     Accordingly, the Stipulated Decree of Divorce did not address the ownership of Krause-Allbee Trucking.

64.     Relator relied on the representations of Ms. Millin's attorney in agreeing to the Stipulated Decree of Divorce.

65.     On or about April 10, 2015, a decree of divorce was granted as to Relator and Ms. Millin.

**Relator Undertakes to Determine His Ownership of Stock in Krause-Albee Trucking**

66.     Towards the end of the divorce action and following the decree of divorce entered on April 10, 2015, Relator undertook to investigate whether he was or is an owner of stock of Krause-Allbee Trucking.

67.     On or about May 15, 2015, Relator, by and through his attorney, and pursuant to SDCL 47-1A-1620, requested in writing, as a shareholder of Krause-Allbee Trucking, that Krause-

Allbee Trucking mail to him Krause-Allbee Trucking's most recent financial statements showing in reasonable detail its assets and liabilities and the results of its operations.

68.     Through counsel, the response of one or more of the Defendants to Relator on May 21, 2015, was that according to **Krause, Relator was never a shareholder in Krause-Allbee Trucking**.

69.     On or about June 26, 2015, Relator's attorney again requested documents regarding Krause-Allbee Trucking stating that Realtor is entitled to those documents as a purported stockholder of Krause-Allbee Trucking.

70.     To date, the requested documents have not been provided to Realtor, and further, one or more Defendants have taken the apparent position that Realtor is not now and has never been a stockholder in Krause-Allbee Trucking.

71.     Relator has not, at any time, sold, transferred or conveyed any stock he owns in Krause-Allbee Trucking, nor has he authorized any other person or entity to sell, transfer or convey, on his behalf, any stock he owns in Krause-Allbee Trucking.

72.     Upon information and knowledge, Relator has not received distributions or dividends from Krause-Allbee Trucking, despite the fact that Defendants represented to the FSA and South Dakota Secretary of State that Relator is a stockholder of Krause-Allbee Trucking.

## VI.     DETAILED STATUTORY FRAMEWORK

73.     The detailed statutory framework for FSA payments is contained in this section. As stated above, Defendants received payments in excess of those to which they were entitled under the FSA due to the false Farm Operating Plans and other documents filed with the FSA, which were material in the FSA's decision-making process to provide farm subsidies to Defendants.

74.     In 1996, Congress enacted the Federal Agriculture and Reform Act of 1996, P.L. 104-127, known also as the Freedom to Farm Act ("Freedom to Farm Act") and created direct program payments to replace the former system of payments which were linked between income support payments and farm prices.  As stated below, these direct payments existed until the 2014 Farm Bill replaced them with different programs.

**2002 Farm Bill[2]**

75.     The Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 (the "2002 Farm Bill") provided three types of farm subsidies: (1) direct payments; (2) counter-cyclical payments ("CCP") programs; and (3) loan deficiency payments and marketing loan gains.  These programs are limited by payment eligibility requirements.

76.     The direct payments provided for fixed, annual payments for "covered commodities" for each crop year between 2002 and 2007.  7 U.S.C. § 7901.  The direct payments remained the same for producers for each year, and the amount to be paid equaled (1) the "payment rate" for the particular commodity, (2) the "payment acres," which are derived from the "base acres" for the commodity, and (3) the "payment yield" for the commodity.  7 U.S.C. § 7913.  Direct payments for 2002 were to be made as soon as practicable, where payments for the 2003 through 2007 crop years could be made in advance.  *Id.*  In order to receive direct payments, a producer had to agree to comply with all requirements and submit annual acreage reports.  7 U.S.C. §§ 7913, 7915.  The payment limitation for direct payments under the 2002 Farm Bill was forty thousand dollars ($40,000.00) per year per person.  7 U.S.C. § 7992.

---

[2] Information about the 2002 Farm Bill is provided as background.  Although Relator believes that Defendants made false claims under the 2002 Farm Bill, this lawsuit is focused on false claims made under the 2008 Farm Bill and the 2014 Farm Bill.

77.     CCP was a new payment program introduced under the 2002 Farm Bill. CCP payments were made for each of the covered commodities when the "effective" price for a covered commodity fell below the established "target price." 7 U.S.C. § 7914. In order to receive CCP payments, a producer had to agree to comply with all requirements and submit annual acreage reports. 7 U.S.C. §§ 7913, 7915. The payment limitation for CCP payments under the 2002 Farm Bill was sixty-five thousand dollars ($65,000.00) per person. 7 U.S.C. § 7992; 7 C.F.R. § 1400.1(g) (effective until Dec. 22, 2008).

78.     In order to be eligible for direct payments, the producer had to be a "person" and be "actively engaged in farming" as defined by federal law. *See generally* 7 C.F.R. § 1400.3 (2002); 7 C.F.R. § 1400.201 (2002).

79.     From 1989 until 2008, the FSA limited the amount of payments persons could receive pursuant to the so-called "three-entity rule." The three-entity rule allowed the payment limitations to be doubled but only allows a person to collect farm subsidies, either directly or indirectly, through three avenues. For example, an individual who received payments as an individual could not receive program payments from more than two entities.

**2008 Farm Bill**

80.     Under the Food, Conservation, and Energy Act of 2008 (Pub. L. 110-234, H.R. 2419, 122 Stat. 023, enacted May 22, 2008) (the "2008 Farm Bill"), a person actively engaged in farming could receive payments from the FSA for the following programs: direct program payments, Average Crop Revenue Election ("ACRE"), Supplemental Revenue Assistance Payments ("SURE"), and disaster programs.

A.      Under the 2008 Farm Bill, an eligible person (i.e., farmer) could choose to participate in ACRE or he could continue to enroll in the traditional programs. If a farmer

participated in ACRE, the farmer's direct payments and countercyclical payments were reduced by 20% and loan payments were reduced by 30%. *See* 7 C.F.R. § 1400.1. Once the farmer selected the payment program, such election was final. A farmer could elect to receive advance ACRE payments. 7 U.S.C. § 7913(d). A producer who received direct payments pursuant to the ACRE program had to agree to abide by certain conditions and file certain documentation, including but not limited to acreage reports and Farm Operating Plans. 7 U.S.C. § 7915.

        B.     The SURE program was a permanent disaster program created by the 2008 Farm Bill to replace previous ad hoc disaster programs. The SURE program was a revenue-based program, wherein payments were made by comparing the expected revenue to actual revenue for the entire farming operation. *See generally* 7 U.S.C. § 7914. A producer who received direct payments pursuant to the SURE program had to agree to abide by certain conditions and file certain documentation, including but not limited to acreage reports and Farm Operating Plans. 7 U.S.C. § 7915.

        C.     Under the 2008 Farm Bill, "person" is defined as follows:

(1) A person is:

> (i) An individual, including any individual participating in a farming operation as a partner in a general partnership, a participant in a joint venture, or a participant in a similar entity;

> (ii) A corporation, joint stock company, association, limited partnership, limited liability partnership, limited liability company, irrevocable trust, revocable trust combined with the grantor of the trust, estate, or charitable organization, including any such entity or organization participating in the farming operation as a partner in a general partnership, a participant in a joint venture, a grantor of a revocable trust, or as a participant in a similar entity; and

> (iii) A State, political subdivision, or agency thereof.

23

> (2) In order for an individual or entity, other than an individual or entity that is a member of a joint operation, to be considered a separate person for the purposes of this part, in addition to other provisions of this part, the individual or entity must:

>> (i) Have a separate and distinct interest in the land or the crop involved;

>> (ii) Exercise separate responsibility for such interest; and

>> (iii) Maintain funds or accounts separate from that of any other individual or entity for such interest.

> (3) With respect to an individual or entity that is a member of a joint operation, such individual or entity will have met the requirements of paragraph (2) of this definition if the joint operation meets the requirements of such paragraph.

> (4) Any cooperative association of producers that markets commodities for producers shall not be considered a person with respect to the commodities so marketed for producers.

7 C.F.R. § 1400.3 (effective Nov. 15, 2006 to Dec. 22, 2008) (emphasis added).

        D.      Both the SURE and ACRE programs were limited to a "producer," which,

in addition to the definition of person above, was defined as follows:

> The term "producer" means an owner, operator, landlord, tenant, or sharecropper that shares in the risk of producing a crop and is entitled to share in the crop available for marketing from the farm, or would have shared had the crop been produced.

7 U.S.C. § 7901(12) (emphasis added).

        E.      The payment limitations for ACRE or direct payments under the 2008 Farm

Bill (whichever the producer choose) were limited to $40,000 per person actively engaged in

farming. 7 C.F.R. § 1400.1(g) (effective until Dec. 22, 2008). The payment limitations for the

SURE program were limited to $65,000. *Id.* Other payment limitations for other programs also

exist, *see id.*, but, as to Relator's knowledge, are inapplicable here.

24

F.      The 2008 Farm Bill revised the eligibility limits in three ways: (1) by reducing income eligibility limits, i.e. the adjusted gross income ("AGI") limitation, to $500,000 of non-farm AGI and $750,000 of farm AGI; (2) eliminating the three-entity rule; and (3) requiring direct attribution of payments to a living person.  Direct attribution credits an individual with the amount of payments received directly and the amount received indirectly by holding an interest in an entity receiving a payment:

> (a) A payment made directly to a person or legal entity will be combined with the pro rata interest of the person or legal entity in payments received by a legal entity in which the person or legal entity has a direct or indirect ownership interest, unless the payments of the legal entity have been reduced by the pro rata share of the person or legal entity.

> (b) A payment made to a legal entity will be attributed to those persons who have a direct and indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the pro rata share of the person.

> (c) Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

>> (1) First level of ownership--any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-tier or payment legal entity;

>> (2)

>>> (i) Second level of ownership--any payment made to a first-tier legal entity that is owned in whole or in part by another legal entity (referred to as a second-tier legal entity) will be attributed to the second-tier legal entity in proportion to the ownership of the second-tier legal entity in the first-tier legal entity;

>>> (ii) If the second-tier legal entity is owned in whole or in part by a person,

the amount of the payment made to the first-tier legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-tier legal entity by the person.

(3) Third and fourth levels--except as provided in paragraph (2)(ii) of this section, any payments made to a legal entity at the third and fourth tiers of ownership will be attributed in the same manner as specified in paragraph (2)(i) of this section.

(4) Fourth-tier ownership--if the fourth-tier of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-tier or payment legal entity in the amount that represents the indirect ownership in the first-tier or payment legal entity by the fourth-tier legal entity.

(d) For purposes of administering direct attribution, and to determine a person's or legal entity's ownership interest in a legal entity that receives a payment subject to limitation; the ownership interest on June 1 of each year will be used.

(e) Direct attribution of payments is not applicable to a cooperative association of producers with respect to commodities produced by the members of the association that are marketed by the association on behalf of the members of the association. The payments will instead be attributed to the producers as persons.

7 C.F.R. § 1400.105 (effective Dec. 23, 2008) (emphasis added). The interim rules applicable under the 2008 Farm Bill require records to be kept demonstrating that each stockholder was actively engaged in farming. *See Farm Program Payment Limitation and Payment Eligibility for 2009 and Subsequent Crop, Program, or Fiscal Years*, 73 FR 79267-01 (Dec. 29, 2008).

G.     Under the 2008 Farm Bill, spouses were treated as one person. *See generally* 7 C.F.R. § 1400.105 (effective Dec. 23, 2008); 7 C.F.R. § 1400.202 (effective Dec. 23, 2008).

**2014 Farm Bill**

81.     The Agricultural Act of 2014, H.R. 2642; Pub. L. 113-79 ("2014 Farm Bill")

eliminated direct payments, counter-cyclical payments, and the average crop election program, but

added two new farm subsidy programs (Agriculture Risk Coverage and Price Loss Coverage) and

two new crop insurance programs (Supplemental Coverage Option and Stacked Income Protection

Plan). These new programs went into effect in 2015.

A.     The 2014 Farm Bill limited the Price Loss Coverage, Agricultural Risk

Coverage, Loan Deficiency Program, and Marketing Loan Gain payments to a total combined

amount of $125,000.  7 C.F.R. § 1400.1(g) (effective Dec. 16, 2015).  The limits are doubled for

spouses if one spouse is actively engaged in farming.

B.     The 2014 Farm Bill continues the direct attribution rules of the 2008 Farm

Bill:

> (a) A payment made directly to a person or legal entity will be
> combined with the pro rata interest of the person or legal entity in
> payments received by a legal entity in which the person or legal
> entity has a direct or indirect ownership interest, unless the
> payments of the legal entity have been reduced by the pro rata share
> of the person or legal entity.
>
> (b) A payment made to a legal entity will be attributed to those
> persons who have a direct and indirect ownership interest in the legal
> entity, unless the payment of the legal entity has been reduced by
> the pro rata share of the person.
>
> (c) Attribution of payments made to legal entities will be tracked
> through four levels of ownership in legal entities as follows:
>
>> (1) First level of ownership—any payment made to a
>> legal entity that is owned in whole or in part by a
>> person will be attributed to the person in an amount
>> that represents the direct ownership interest in the
>> first-tier or payment legal entity;
>>
>> (2)
>>
>>> (i) Second level of ownership—any
>>> payment made to a first-tier legal

27

entity that is owned in whole or in part by another legal entity (referred to as a second-tier legal entity) will be attributed to the second-tier legal entity in proportion to the ownership of the second-tier legal entity in the first-tier legal entity;

(ii) If the second-tier legal entity is owned in whole or in part by a person, the amount of the payment made to the first-tier legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-tier legal entity by the person.

(3) Third and fourth levels—except as provided in paragraph (2)(ii) of this section, any payments made to a legal entity at the third and fourth tiers of ownership will be attributed in the same manner as specified in paragraph (2)(i) of this section.

(4) Fourth-tier ownership—if the fourth-tier of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-tier or payment legal entity in the amount that represents the indirect ownership in the first-tier or payment legal entity by the fourth-tier legal entity.

(d) For purposes of administering direct attribution, and to determine a person's or legal entity's ownership interest in a legal entity that receives a payment subject to limitation; the ownership interest on June 1 of each year will be used.

(1) If the change in ownership interest is due to the death of an interest holder in the legal entity or the legal entity did not exist on June 1 of the applicable year, the Deputy Administrator may determine that a change after June 1 is considered relevant or effective for the current year.

(2) Changes that occur after June 1 cannot be used to increase the amount of program payments a legal entity, or its members, is eligible to receive directly or indirectly for the applicable year.

28

> (e) Direct attribution of payments is not applicable to a cooperative association of producers with respect to commodities produced by the members of the association that are marketed by the association on behalf of the members of the association. The payments will instead be attributed to the producers as persons.

7 C.F.R. § 1400.105 (effective Jan. 7, 2010) (emphasis added)

     C.     Under the 2014 Farm Bill, "person" is defined as follows:

> (a) <u>A person will be considered to be actively engaged in farming with respect to a farming operation if</u>:

>> (1) <u>The person independently and separately makes a significant contribution to a farming operation</u> of:

>>> (i) <u>Capital, equipment, or land, or a combination of capital, equipment, or land</u> **and**

>>> (ii) <u>Active personal labor or active personal management, or a combination of active personal labor and active personal management</u>;

>> (2) <u>Has a share of the profits or losses</u> from the farming operation commensurate with the person's or legal entity's contributions to the operation; and

>> (3) <u>Makes contributions to the farming operation that are at risk for a loss</u>, with the level of risk being commensurate with the person's or legal entity's claimed share of the farming operation.

7 C.F.R. § 1400.202 (effective Jan. 7, 2010) (emphasis added).

     D.     Under the 2014 Farm Bill, all officers of a corporation have to make a contribution of active personal labor, management, or a combination thereof or the farm subsidy payment to the corporation must be reduced by such ownership percentage:

> (a) A limited partnership, limited liability partnership, limited liability company, corporation, or other similar legal entity will be considered to be actively engaged in farming with respect to a farming operation if:

>> (1) The legal entity independently and separately makes a significant contribution to the farming operation of capital, equipment, or land, or a combination of capital, equipment, or land;

(2) Each partner, stockholder, or member with an ownership interest or their spouse with an ownership interest makes a contribution, whether compensated or not compensated, of active personal labor, active personal management, or a combination of active personal labor and active personal management to the farming operation; that are:

(i) Performed on a regular basis;

(ii) Identifiable and documentable; and

(iii) Separate and distinct from such contributions of any other partner, stockholder or member of the farming operation;

(3) The collective contribution of the partners, stockholders and members is significant and commensurate;

(4) The legal entity has a share of the profits or losses from the farming operation commensurate with the legal entity's contributions to the operation; and

(5) The legal entity makes contributions to the farming operation that are at risk for a loss, with the level of risk being commensurate with the legal entity's claimed share of the farming operation.

(b) If any partner, stockholder, or member fails to meet the requirements in paragraph (a)(2) of this section, any program payment and benefit subject to this subpart provided to the legal entity will be reduced by an amount commensurate with the ownership share held by that partner, stockholder, or member in the legal entity.

(c) An exception to paragraph (b) of this section will apply if:

(1) At least 50 percent of the stock is held by partners, stockholders, or members that are actively providing labor or management and

(2) The partners, stockholders, or members are collectively receiving, directly or indirectly, total payments equal to or less than one payment limitation.

(d) For a farming operation conducted by a legal entity in which the capital, land, or equipment is contributed by the legal entity, such capital, land, or equipment:

(1) To meet the requirements of paragraph (a)(1) of this section, must be contributed directly by the legal entity and must not be acquired as a loan made to, guaranteed, co-signed, or secured by:

(i) Any person, legal entity, or joint operation that has an interest in such farming operation, including the legal entity's members;

(ii) Such legal entity by any person, legal entity, or other joint operation that has an interest in such farming operation; or

(iii) Any person, legal entity, or joint operation in whose farming operation such legal entity has an interest, and

(2) To meet the requirements of paragraphs (a)(4) and (a)(5) of this section, and if acquired as a result of a loan made to, guaranteed, co-signed, or secured by the persons, legal entities, or joint operations as defined, the loan must:

(i) Bear the prevailing interest rate and

(ii) Have a repayment schedule considered reasonable and customary for the area.

7 C.F.R. § 1400.204 (effective Jan. 7, 2010) (emphasis added).

E.     To ensure that persons who are claimed to have been actively engaged in farming where actually doing so, the regulations require recordkeeping as follows:

(a) Any farming operation requesting that more than one person qualify as making a significant contribution of active personal management, or a significant contribution of the combination of active personal labor and active personal management, must maintain contemporaneous records or activity logs for all persons that make any contribution of any management to a farming operation under this subpart that must include, but are not limited to, the following:

(1) Location where the management activity was performed; and

(2) Time expended and duration of the management activity performed.

(b) To qualify as providing a significant contribution of active personal management each person covered by this subpart must:

(1) Maintain these records and supporting business documentation; and

(2) If requested, timely make these records available for review by the appropriate FSA reviewing authority.

31

(c) If a person fails to meet the requirement of paragraphs (a) and (b) of this section, then both of the following will apply:

(1) The person's contribution of active personal management as represented to the farming operation for payment eligibility purposes will be disregarded; and

(2) The person's payment eligibility will be re-determined for the applicable program year.

7 C.F.R. § 1400.603 (effective Dec. 16, 2015).

## VII.   CLAIMS FOR RELIEF

### COUNT ONE

### False Claims Act (31 U.S.C. § 3729(a)(1))

82.     Relator re-alleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

83.     Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

84.     By virtue of the false or fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to treble damages in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### COUNT TWO

### False Claims Act: Making or Using False Record or Statement (31 U.S.C. § 3729(a)(2))

85.     Relator repeats and realleges the preceding paragraphs and allegations, as if fully set forth herein.

86.     Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

87.     By virtue of the false or fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to treble damages, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT THREE

**False Claims Act: Conspiring to Defraud the Government (31 U.S.C. § 3729(a)(3))**

88.     Relator repeats and realleges the preceding paragraphs and allegations, as if fully set forth herein.

89.     Defendants conspired with one another to defraud the government by getting false or fraudulent claims allowed or paid.

90.     By virtue of the false or fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to treble damages, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT FOUR

**False Claims Act: Reverse False Claims (31 U.S.C. § 3729(a)(7))**

91.     Relator repeats and realleges the preceding paragraphs and allegations, as if fully set forth herein.

92.     Defendants knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to property to the United States.

93.     By virtue of the false or fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to treble damages in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT FIVE

**Declaratory Judgment**

94.     Relator re-alleges and incorporates by reference the preceding paragraphs and allegations of this Complaint as though fully set forth herein.

95.     Pursuant to 28 U.S.C. § 2201, Relator asks the Court to declare the ownership interest for Krause-Allbee Trucking, whether Relator has or had any interest in Krause-Allbee Trucking, the percentage interest Realtor has or had in Krause-Allbee Trucking, and any rights Relator has or had pursuant to such interest and any damages Relator sustained as a result of Defendants' false claims.

## COUNT SIX

### Unjust Enrichment

96.     Relator re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

97.     Relator may have unknowingly conferred a benefit upon Defendants regarding ownership of the stock of Krause-Allbee Trucking.

98.     Defendants are cognizant of the benefit.

99.     Retention of the benefit by Defendants without reimbursing Relator would unjustly enrich Defendants.

100.    One or more of the Defendants have been unjustly enriched, including without limitation, by the payments Krause-Allbee Trucking has received from its participation in farm programs of the United States Department of Agriculture.

101.    One or more of the Defendants have been unjustly enriched by the assets, dividends, and/or distributions of Krause-Allbee Trucking, to the detriment of Relator.

## VIII.  PRAYER

**WHEREFORE**, Relator respectfully requests judgment against Defendants as follows:

1.     That by reason of the violations of the False Claims Act as set out in Counts One through Four, including any other entities through which one or more Defendants violated the False Claims Act, this Court enter judgment against Defendants jointly and severally in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of 31 U.S.C. § 3729;

2.     That Relator, as a Qui Tam Plaintiff, be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;

3.     That Relator be awarded punitive damages;

4.     That the Court declare the ownership interest in Krause-Allbee Trucking, and Relator's current or former ownership interest or rights, if any, in Krause-Allbee Trucking as stated in Count Five.

5.     That Relator be awarded damages for unjust enrichment as stated in Count Six.

6.     That Relator be awarded all costs of this action, including attorneys' fees and Court costs; and

7.     That the Court grants such other relief as it deems just and proper.

**RELATOR DEMANDS A JURY TRIAL ON ALL ISSUES TRIABLE TO A JURY.**

Dated this 18th day of July, 2016.    Lindquist & Vennum LLP

By: _____
Lee A. Magnuson
Jonathan M. Bye (to be admitted *pro hac vice*)
Nicole O. Tupman
101 South Reid Street, Suite 302
Sioux Falls, SD 57103
Telephone: (605) 978-5200
Email:  lmagnuson@lindquist.com
        jbye@lindquist.com
        ntupman@lindquist.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on 18th day of July, 2016, a true and correct copy of

the foregoing *FALSE CLAIMS ACT AND DEMAND FOR TRIAL BY JURY* in the above-

entitled matter, was served on the Attorney General of the United States and the United States

Attorney for the District of South Dakota as follows:

United States Attorney for the District of    United States Attorney General
South Dakota                                  U.S. Department of Justice
230 S. Phillips Ave.                          950 Pennsylvania Avenue, NW
Sioux Falls, SD 57104                         Washington, DC 20530-0001

*Via Hand Delivery*                           *Via U.S. Certified Mail*

**LINDQUIST & VENNUM LLP**

_____
*Attorneys for Relator*